IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PARALLEL IRON, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 12-769 (RGA) |
| | ) | |
| NETAPP, INC., | ) | REDACTED - PUBLIC |
| | ) | VERSION |
| Defendant. | ) | |

**DEFENDANT NETAPP, INC.'S OPENING BRIEF IN SUPPORT OF ITS
MOTION TO DECLARE CASE EXCEPTIONAL AND AWARD ATTORNEYS'
FEES UNDER 35 U.S.C. § 285 AND THIS COURT'S INHERENT POWER**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Rodger D. Smith (#3778)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com
mflynn@mnat.com

*Attorneys for Defendant NetApp, Inc.*

OF COUNSEL:

Natalie Hanlon-Leh
Joel D. Sayres
FAEGRE BAKER DANIELS LLP
3200 Wells Fargo Center
1700 Lincoln Street
Denver, CO  80203
(303) 607-3500

March 31, 2014 - Original and Redacted Filing Date

## TABLE OF CONTENTS

I.   NATURE AND STAGE OF THE PROCEEDING ................................................................. 1

II.  STATEMENT OF FACTS ................................................................................................ 2

    A.   The Parties .......................................................................................................... 2

        1.   NetApp ..................................................................................................... 2
        2.   PI and IPNav .......................................................................................... 3

    B.   PI Sues NetApp and 26 Other Defendants Based on an Unenforceable Patent ....... 4

        1.   PI sues in the Eastern District of Texas on the related '565 Patent ............ 4
        2.   PI sues numerous defendants in Delaware on the same '565 Patent .......... 4
        3.   The '565 Patent is unenforceable, as a reasonable pre-suit
            investigation would have shown ............................................................... 5

    C.   PI Brings This Action Based on pNFS, Only to Abandon Its Claims After
        NetApp Incurred Substantial Costs And Business Disruption ............................... 6

        1.   PI Files Its Complaint Naming pNFS ...................................................... 6
        2.   PI Repeatedly Identifies pNFS as the Accused Instrumentality in its
            Paragraph 4(a) Disclosures and Untimely Amendments ........................... 7
        3.   NetApp Sends a Letter Raising its Concerns about PI's Identification
            of pNFS, but PI Never Responds ............................................................. 8
        4.   PI Serves Broad and Vague Infringement Contentions and Leaves it
            to NetApp to Sort Out .............................................................................. 9
        5.   PI Plays Fast and Loose with Discovery and Claim Construction ........... 10
        6.   This Court Stays the Case Based on PI's Prejudicial Shift in
            Infringement Contentions ...................................................................... 10
        7.   IPNav Exits the Litigation ..................................................................... 11
        8.   PI Agrees to Dismiss This Action Based on a Sublicense to NetApp ...... 11
        9.   NetApp Incurs Substantial Costs and Disruption Based on PI's
            Conduct ................................................................................................. 11

III. ARGUMENT ................................................................................................................ 12

    A.   NetApp Is the Prevailing Party .......................................................................... 12

    B.   This Case is Exceptional Based on PI's Material Inappropriate Conduct
        Related to the Litigation ..................................................................................... 13

        1.   PI Had No Reasonable Basis for Bringing This Suit ............................... 13
        2.   PI's Litigation Misconduct Also Supports an Exceptional Case
            Finding ................................................................................................. 14

C. This Case is Also Exceptional Because it was Objectively Baseless Litigation and Brought in Bad Faith ..................................................................16

  1. This Case Is Objectively Baseless ............................................. 16
  2. PI Brought This Case in Subjective Bad Faith ......................... 16

D. PI's Conduct Exemplifies the Sort of Abuse Section 285 Is Intended to Remedy ...............................................................................................18

E. An Award of Fees Is Also Appropriate under the Court's Inherent Power to Manage Its Own Docket ................................................................18

IV. CONCLUSION ..............................................................................................20

## TABLE OF AUTHORITIES

Page(s)

CASES

*Braley v. Campbell,*
    832 F.2d 1504 (10th Cir. 1987) ................................................................18

*Brooks Furniture Mfg. v. Dutailier Int'l, Inc.,*
    393 F.3d 1378 (Fed. Cir. 2005)................................................................12

*Chambers v. NASCO, Inc.,*
    50 U.S. 32 (1991)................................................................................19

*Colgate-Palmolive Co. v. Carter Products, Inc.,*
    230 F.2d 855 (4th Cir. 1956) ................................................................18

*Eltech Sys. Corp. v. PPG Indus., Inc.,*
    903 F.2d 805 (Fed. Cir. 1990)................................................................17

*Eon-Net LP v. Flagstar Bancorp,*
    653 F.3d 1314 (Fed. Cir. 2011)........................................................15, 17

*F.J. Hanshaw Enters. v. Emerald River Dev., Inc.,*
    244 F.3d 1128 (9th Cir. 2001) ................................................................18

*Highmark, Inc. v. Allcare Health Mgmt. Sys.,*
    687 F.3d 1300 (Fed. Cir. 2012)........................................................15, 16

*Highway Equip. Co. v. FECO, Ltd.,*
    469 F.3d 1027 (Fed. Cir. 2006)................................................................12

*Kilopass Tech., Inc. v. Sidense Corp.,*
    738 F.3d 1302 (Fed. Cir. 2013)................................................... *passim*

*Mathis v. Spears,*
    857 F.2d 749 (Fed. Cir. 1988)................................................................18

*Parallel Iron, LLC v. Accela Comms., Inc. et al.,*
    No. 6:11-cv-00036-LED (E.D. Tex., filed Jan. 19, 2011) .........................3

*Parallel Iron, LLC v. Adconion Media Inc. et al.,*
    C.A. No. 11-799-RGA ................................................................4

*Parallel Iron LLC v. Adknowledge Inc.,*
    No. 11-799-RGA, 2012 WL 5392251 (D. Del. Nov. 2, 2012) .....................5

*Rambus Inc. v. Infineon Techs. AG,*
    318 F.3d 1081 (Fed. Cir. 2003)................................................................13

*Ray v. Eyster (In re Orthopedic "Bone Screw" Prods. Liab. Litig.),*
   132 F.3d 152 (3d Cir. 1997)......................................................................................18

*Renaissance Learning, Inc. v. Doe,*
   No. 11-cv-166, 2011 U.S. Dist. LEXIS 136700 (W.D. Wis. Nov. 29, 2011) ..........................3

*View Eng'g, Inc. v. Robotic Vision Sys.,*
   208 F.3d 981,986 (Fed. Cir. 2000)..............................................................................13

## STATUTES

35 U.S.C. § 285.............................................................................................*passim*

## OTHER AUTHORITIES

Fed. R. Civ. P. 11...........................................................................................12, 13

D. Del. LR 54.1(c) .............................................................................................12

## I.     NATURE AND STAGE OF THE PROCEEDING

Parallel Iron's ("PI") conduct in this second suit it brought against NetApp demonstrates three things unequivocally:  (1) this case was baseless and never should have been brought; (2) PI conducted no reasonable investigation before bringing this case; and (3) PI engaged in prejudicial and vexatious litigation conduct, including by repeatedly asserting a baseless infringement theory, ignoring NetApp's requests for information, and adopting a cavalier approach to the litigation—including discovery and claim construction—intended to minimize its own effort while imposing unnecessary costs and burdens on NetApp (and other defendants) to encourage early nuisance value settlement. This is a quintessential example of an exceptional case under 35 U.S.C. § 285 and NetApp should be awarded its attorneys' fees.

This motion is the culmination of two lengthy strings of lawsuits brought by PI against NetApp and dozens of other defendants based on patents that should not have been asserted. First, PI sued NetApp and more than two dozen other defendants in a series of lawsuits, based on a patent that it ultimately conceded was unenforceable.  Undeterred, PI dropped that suit and immediately sued on three related patents, alleging broad and vague boilerplate allegations against about forty defendants, including NetApp.  NetApp was forced to litigate on an infringement theory that PI initially asserted without any reasonable basis, and then reaffirmed three times over the course of almost a year.  During this period, NetApp repeatedly attempted to get PI to clarify its position to avoid having to litigate.  In the end, PI acknowledged that the theory that it had pursued for nearly a year was baseless by eventually dropping it with no notice or explanation to NetApp.

While attempting to get PI to drop its unsubstantiated accusations, NetApp had to investigate and defend against that theory, hindered by PI's litigation misconduct, including its

assertion of vague and contradictory allegations, repeated violations of this Court's Scheduling Order, failure to inform NetApp that it had jettisoned its original infringement theory, and a bare-bones approach to discovery and claim construction.  In short, PI filed an objectively baseless lawsuit without adequate pre-suit investigation and then engaged in vexatious and unjustified litigation.  PI's conduct is a further—and exceptional—example of its pattern of meritless litigation, and has caused NetApp to incur substantial costs and business disruption.  NetApp therefore respectfully requests that it be awarded attorneys' fees.

## II.    STATEMENT OF FACTS

### A.    The Parties

#### 1.    NetApp

Defendant NetApp, Inc. ("NetApp") is a Delaware corporation, with its headquarters in Sunnyvale, California.  (D.I. 7, ¶ 2.)  NetApp is a leading provider of innovative storage systems and data management solutions that form the foundation for efficient and flexible information technology infrastructures.    NetApp understands and respects intellectual property rights, including patent protection.  Indeed, NetApp has been recognized for its innovation prowess, as a top 300 United States patent holder since 2006, and as having a high quality patent portfolio. *See* Intellectual Property Owners Assoc., *Top 300 Organizations Granted U.S. Patents, 2006 - present*; The World's Most Innovative Companies, Forbes, 2012 & 2013 (ranking NetApp in Top 100); IEEE Spectrum, *Patent Power Scorecard, Computer Peripherals & Storage* (ranking NetApp in Top 20 in terms of patent portfolio quality).

As a globally recognized innovator in its industry, a large patent holder, a strong advocate for the United States patent laws, and a company whose corporate culture encourages doing the "right thing," NetApp is a consistent proponent of maintaining a balanced patent system. NetApp believes in the need to litigate fairly, to assert positions when there is a reasonable basis

supported by an adequate review, and to conduct litigation in good faith while avoiding vexatious or unjustified claims or defenses. NetApp's approach to the U.S. patent system includes standing up and calling out blatant patent litigation misconduct, which only weakens that system. Over nearly a decade, NetApp has taken this approach unwaveringly and has established that every case brought against it without justification should be justly disposed of in NetApp's favor. NetApp's vigorous defense of such suits is not done to feed into the rhetoric of name-calling, but to demonstrate NetApp's decision not to tolerate baseless suits coupled with litigation misbehavior that erodes the credibility of our patent system.

### 2.    PI and IPNav[1]

Plaintiff PI is a limited liability company that was formed in Delaware just seven days before filing this action (as well as related actions against many other defendants). Previously, PI was organized in Texas, where it first brought patent litigation against numerous defendants in the Eastern District of Texas. *See Parallel Iron, LLC v. Accela Comms., Inc. et al.*, No. 6:11-cv-00036-LED (E.D. Tex., filed Jan. 19, 2011). PI does not make or sell any products or services; its business is asserting patents against other companies.

To monetize its patents, PI has been directed by IP Navigation Group ("IPNav"). According to one study, IPNav is the most active non-practicing-entity ("NPE") litigant in the country, leading all NPEs in both the number of cases filed and the number of defendants named. *See* RPX Corp., *2012 NPE Activity Report* (2012), at 29-30. From 2008 to 2012, IPNav, through companies like PI, sued 1,638 defendants in 446 cases. *Id.* at 30. And this does not take into account IPNav's pre-filing actions. *See Renaissance Learning, Inc. v. Doe*, No. 11-cv-166, 2011 U.S. Dist. LEXIS 136700, at *10-11 (W.D. Wis. Nov. 29, 2011) (finding that "IP Nav's

---

[1]    NetApp believes that IPNav is the alter ego of PI, that it directed and used PI as a shell during the course of this litigation, and that IPNav should be held responsible for the conduct of PI.

refusal to identify its client or the patents at issue, along with the unnecessarily tight ten-day response deadline, reasonably can be viewed as components of a strategy to preclude Renaissance from obtaining the facts it needed to file a declaratory judgment action").

IPNav directed PI in this and the other PI cases. Indeed, it appears that PI was a shell in IPNav's efforts to extract nuisance-value settlements from the dozens of defendants it sued. Once IPNav dropped out of the picture in late 2013, PI abruptly changed its counsel. *See* Declaration of Joel D. Sayres ("Sayres Decl."), ¶¶ 2-3, Exs. A-C; C.A. No. 12-763, D.I. 62. Shortly thereafter, PI dismissed its cases against the remaining defendants. By February, all of PI's cases except this one had been dismissed.

**B.     PI Sues NetApp and 26 Other Defendants Based on an Unenforceable Patent**

1.     PI sues in the Eastern District of Texas on the related '565 Patent

First, PI, then a Texas company, asserted a patent related to the patents-in-suit against six defendants in the Eastern District of Texas, asserting U.S. Patent No. 7,415,565 (the "'565 Patent"). *See* C.A. No. 6:11-36-LED (E.D. Tex., filed Jan. 19, 2011). In its complaint, PI parroted the same broad and vague allegations against each defendant (accusing simply "a file storage system, which is covered by one or more claims of the '565 patent") without identifying any specific product or instrumentality, or patent claims. *Id.* D.I. 1, ¶¶ 19-24. As explained below, the asserted patent was unenforceable and thus should never have been asserted. However, PI entered into settlement agreements with several defendants before they discovered that the case was baseless.

2.     PI sues numerous defendants in Delaware on the same '565 Patent

PI, while still a Texas entity, then sued 15 defendants on the '565 Patent in this Court on September 9, 2011, asserting similar boilerplate, broad, and vague allegations, this time simply accusing "a Hadoop Distributed File System." *Parallel Iron, LLC v. Adconion Media Inc. et al.*,

4

C.A. No. 11-799-RGA. D.I. 1, ¶¶ 23-35.  PI then filed additional lawsuits in this Court, asserting

the '565 Patent against six more defendants, including NetApp.  *See* C.A. No. 12-cv-121-RGA;

C.A. No. 12-cv-500-RGA; C.A. No. 12-cv-501-RGA; C.A. No. 12-cv-502-RGA; C.A. No. 12-

cv-503-RGA.  With respect to NetApp, PI simply and vaguely referenced "pNFS" as the accused

instrumentality, and identified no other accused technology or theory of infringement.  C.A. No.

12-cv-502-RGA, D.I. 1, ¶ 12.

> 3.    The '565 Patent is unenforceable, as a reasonable pre-suit investigation would have shown

Over the course of 15 months, PI sued 27 defendants on the '565 Patent, asserting broad

and vague allegations of infringement.  None of these cases should have been brought, because

the '565 Patent was unenforceable before PI filed its first action.  Specifically, the '565 Patent

was subject to a terminal disclaimer requiring that there be common ownership with another

patent, which the '565 Patent did not have.  *See Parallel Iron LLC v. Adknowledge Inc.*, No. 11-

799-RGA, 2012 WL 5392251, at *1 (D. Del. Nov. 2, 2012).  Thus, the '565 Patent was

unenforceable before PI filed suit, and PI should have known this with a reasonable

investigation.[2]  PI's efforts to obtain settlements from 27 companies based on an unenforceable

patent resulted in substantial direct and indirect costs among these companies, as well as a waste

of judicial resources.

For these reasons, defendant EMC Corporation moved for attorneys' fees under 35

U.S.C. § 285.  *Id.* at *1.  This Court found that EMC was "justifiably aggrieved at having spent

in excess of $200,000 in attorneys' fees defending against a meritless suit." *Id.* at *1.  The Court

noted that PI "apparently did not include any consideration of the terminal disclaimer" in its pre-

---

[2]    PI does not dispute that the patent became unenforceable at least as of December 28, 2011, almost four months before PI sued NetApp and five other defendants on the '565 Patent. *See* C.A. No. 11-799, D.I. 124, at 1.

suit investigation despite the fact that "[o]n the face page of the '565 patent, there is the fairly prominent statement, 'This patent is subject to a terminal disclaimer.'" *Id.* Ultimately, the Court was "quite convinced that the litigation was, or became, objectively baseless." *Id.* at 2.

The Court found, however, that EMC had not proven that PI acted in subjective bad faith. *Id.* PI's conduct in the short period of time following the Court's finding on PI's conduct in the EMC case shows that PI's pre-suit investigation deficiencies are in fact part of a pattern of wanton disregard of the fundamental cornerstones set forth by our judicial system.

### C.   PI Brings This Action Based on pNFS, Only to Abandon Its Claims After NetApp Incurred Substantial Costs And Business Disruption

1.   PI Files Its Complaint Naming pNFS

On June 18, 2012, a week after re-organizing in Delaware and **the same day** PI filed its dismissal of its earlier action against NetApp and others based on the unenforceability of the '565 Patent, PI filed this action for patent infringement against NetApp. (D.I.1.) PI sued seven other defendants on the same day, and twenty-nine others thereafter, on the same patents.[3]

PI alleged infringement of three patents: U.S. Patent Nos. 7,197,662, 7,543,177, and 7,958,388. (*Id.* at ¶¶ 12, 13, 18, 23.) In its Complaint against NetApp, as in its previous action against NetApp, PI vaguely identified **pNFS** as the accused instrumentality, and identified no other accused technology or theory of infringement. (D.I.1, ¶¶ 12, 13, 18, 23.) Thus, from the very beginning of PI's actions against NetApp, NetApp focused only on pNFS and only its products and services implementing pNFS. NetApp diligently investigated NetApp's products,

---

[3]     *See* C.A. No. 12-cv-762-RGA; C.A. No. 12-cv-763-RGA; C.A. No. 12-cv-764-RGA; C.A. No. 12-cv-766-RGA; C.A. No. 12-cv-767-RGA; C.A. No. 12-cv-770-RGA; C.A. No. 12-cv-874-RGA; C.A. No. 12-cv-875-RGA; C.A. No. 12-cv-876-RGA; C.A. No. 12-cv-877-RGA; C.A. No. 12-cv-878-RGA; C.A. No. 12-cv-879-RGA; C.A. No. 12-cv-880-RGA; C.A. No. 12-cv-881-RGA; C.A. No. 12-cv-995-RGA; C.A. No. 12-cv-1035-RGA; C.A. No. 12-cv-1468-RGA; C.A. No. 13-cv-307-RGA; C.A. No. 13-cv-367-RGA; 13-cv-443-RGA.

sales, and strategies involving pNFS, analyzed how pNFS might relate to the patents-in-suit, worked closely with NetApp pNFS engineers, searched for prior art relating to pNFS, and sought pNFS experts.

        2.      PI Repeatedly Identifies pNFS as the Accused Instrumentality in its Paragraph 4(a) Disclosures and Untimely Amendments

Eight months later, in its February 15, 2013 Paragraph 4(a) disclosures, PI again identified the accused products only as products implementing pNFS: "Parallel Iron is asserting the patents-in-suit against **all of NetApp 's products and/or services that implement the parallel Network File System (the 'Accused Instrumentalities')** including, but not limited to the NetApp E-Series Platform products and products using the Engenio external storage systems, as described in: Mike Eisler and Joshua Konkle, NetApp, Accelerating Shared data Access for Compute Clusters." (D.I. 43-1 at 2 (emphasis added).) PI's reference to "E-Series Platform products and products using the Engenio external storage systems," further demonstrate PI's lack of pre-suit investigation and unjustified litigation in at least two ways: (1) these products do not and have never implemented pNFS; and (2) the Eisler and Konkle reference included in the Paragraph 4(a) disclosures does not once reference these specific products, but rather concerns only pNFS. *http://www.netapp.com/us/communities/tech-ontap/pnfs.aspx.*

Although this Court set February 15, 2013 as the deadline for serving Paragraph 4(a) disclosures (*see* D.I. 15, at 4), on April 23, 2013, more than two months after that deadline, PI purported to serve "Amended Disclosures". (D.I. 43-1 at 5-6.) On May 7, 2013, almost three months after the deadline, PI purported to serve "Second Amended Disclosures" under Paragraph 4(a). In both amendments, PI again identified the accused instrumentality only as pNFS: **"all of NetApp's products and/or services that implement the parallel Network File System (the "Accused Instrumentalities")."** (*Id.* at 5, 8 (emphasis added).)

PI engaged in similar conduct in other cases as well.  For example, PI served amended 4(a) disclosures on defendant EMC and two sets of amended disclosures on Hitachi two and a half months after the deadline in the Scheduling Order.  See C.A. No. 12-cv-764-RGA, D. I. 39; C.A. No. 12-cv-766-RGA, D.I. 26, 27.  In the Hitachi case, this Court struck PI's untimely amended disclosures based on prejudice sustained by Hitachi.  See C.A. No. 12-cv-766-RGA, D.I. 36 at 14.  During the hearing on Hitachi's motion to strike, PI stated that its disclosures were careless:

> **[PI counsel]**: It was careless.  We probably could have done a better job.
> **Court**: There's no probably about it, is there?
> **[PI counsel]**: Correct.  We should have done a better job on that.

*Id.* at 6.

In short, it appears that PI was engaged in a pattern of inadequate pre-suit investigation and fast and loose infringement allegations, causing prejudice to NetApp while forcing it to defend against its claims.

       3.    NetApp Sends a Letter Raising its Concerns about PI's Identification of pNFS, but PI Never Responds

Shortly after receiving PI's second amended disclosures, on May 16, 2013, NetApp wrote to PI, pointing out (1) the untimeliness of PI's purported amendments to its disclosures; (2) the failure of PI to sufficiently identify an accused product other than its reference to pNFS; and (3) that the E-Series category of products referenced in PI's disclosures did not practice pNFS. (D.I. 43-1 at 11-14.)  NetApp requested the basis for PI's allegations regarding pNFS and a description of its pre-suit investigation.  (*Id.* at 14-16.)  Specifically, NetApp put PI on notice that it did not believe that PI had a case based on pNFS, and that PI should explain its basis for forcing NetApp to litigate this action.

At that point, faced with NetApp's letter and representations, PI could have ended this action. It could have acknowledged NetApp's concerns regarding pNFS, and could have informed NetApp that it was no longer accusing pNFS. It could have allowed NetApp to move on from its investigation, defense, prior art review, and other activities regarding pNFS. It could have spared NetApp's personnel further involvement in this litigation. Instead, PI ignored NetApp's letter and did not respond to NetApp.

        4.     PI Serves Broad and Vague Infringement Contentions and Leaves it to NetApp to Sort Out

On May 25, 2013, a week after receiving NetApp's letter, PI instead served 2,600 pages of infringement contentions. PI accused three broad instrumentalities, and served infringement contentions for each: (1) the "FAS6200"; (2) "E-Series"; and (3) "Open Solution for Hadoop." In those infringement contentions, PI did not mention pNFS but also did not suggest to NetApp that pNFS was no longer in dispute.[4] The extent to which PI's contentions and the numerous citations to third-party websites and other sources (including frequent citations to an un-translated Russian blog) might implicate pNFS, the only technology PI identified as infringing in its Complaint and three sets of earlier disclosures, was not clear. Thus, NetApp carefully reviewed the infringement contentions and the documents cited therein. NetApp researched whether and how PI's infringement contentions might implicate pNFS. Given the lengthy and ambiguous infringement contentions, NetApp's investigation was difficult and time-consuming.

NetApp also served discovery on PI to get to the heart of its contentions regarding pNFS, including documents analyzing whether pNFS infringed the patents-in-suit and the bases for PI's pre-suit investigation. (D.I. 43-1 at 22 (Interrog. No. 1), 51 (RFP No. 19), 56 (RFP No. 44).) PI

---

[4]    Although PI served infringement contentions for "E-Series," these contentions were all based on the purported use of Hadoop with E-Series, and thus were directly contrary to PI's Paragraph 4(a) disclosures.

did not adequately respond to these requests.  Specifically, PI did not serve any documents regarding its first awareness of pNFS or pre-suit investigation, and pointed to its infringement contentions as evidence of its pre-suit investigation.  (*Id.* at 22-23.)  However, PI's infringement contentions do not once reference pNFS.

In addition, NetApp asked PI to identify and provide certain information for claims that implicated an industry standard, since pNFS is an industry standard.  (D.I. 43-1 at 37.)  Based on PI's response, NetApp concluded that PI was no longer accusing pNFS of infringement. Accordingly, on August 20, 2013, NetApp wrote to PI again outlining its concerns (*Id.* at 64-66.).  On a meet-and-confer call on August 22, 2013, after a year of contending that pNFS and only pNFS was the subject of this suit, PI confirmed that it was no longer accusing pNFS. Despite NetApp's May 16 letter and its June 12 discovery requests, at no time before August 22 did PI inform NetApp that it was no longer accusing pNFS.

5.   PI Plays Fast and Loose with Discovery and Claim Construction

As explained more fully below, during the litigation, PI adopted a cavalier approach to discovery and claim construction, perhaps saving itself from expending resources but burdening defendants. *See* Part III.B.2, *infra*.

6.   This Court Stays the Case Based on PI's Prejudicial Shift in Infringement Contentions

Based on PI's actions and the resulting prejudice to NetApp, NetApp sought a conference with the Court.  (D.I. 43.)  The Court agreed with NetApp that by identifying pNFS as the accused instrumentality, only to then change infringement theories a year into the case, PI had led NetApp down a wrong path.  Sayres Decl., Ex. D at 25:10-17.[5]  The Court also agreed that NetApp could not be faulted for spending its time and resources investigating pNFS—"the only

---

[5]    Although the Court concluded that PI's actions were not intentional, as discussed below, NetApp believes that PI's overall conduct in this case evidences bad faith.

theory that was evident from what [Parallel Iron] had said." *Id.* at 14:10-13.  The Court further stated that it "certainly underst[ood] why NetApp might have a decent argument under one or more theories" as to why it should receive compensation from PI based on PI's actions.  *Id.* at 27:4-9.  The Court entered an Order staying this action pending completion of all of the coordinated pending actions PI had brought against other defendants.  (D.I. 50.)

7.     <u>IPNav Exits the Litigation</u>

In November 2013, IPNav split with its Chairman, David Pridham, whose new company took over management of PI's litigation.  Sayres Decl., ¶ 2, Ex. A.  Immediately after IPNav no longer controlled the litigation, PI replaced its lead and local counsel with new attorneys.  *Id.*, ¶ 3, Exs. B, C; C.A. No. 12-763, D.I. 62.  Shortly thereafter, PI dismissed its cases against the remaining defendants.

8.     ██████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████  Thus, the parties agree that NetApp is fully licensed under the asserted patents.

9.     <u>NetApp Incurs Substantial Costs and Disruption Based on PI's Conduct</u>

NetApp expended considerable fees and costs and incurred substantial business disruption based on PI's conduct in this case.  To date, NetApp has spent $660,000 litigating this case; of this amount, NetApp spent $480,000 during the time period from the service of the Complaint until the date PI informed NetApp it was no longer accusing pNFS.  PI's conduct also resulted in severe disruptions to NetApp's business.  *See* Declaration of Michael Eisler ("Eisler Decl."), ¶¶ 6-12.

## III.   ARGUMENT

Under 35 U.S.C. § 285, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party" in patent infringement actions. "A determination of whether to award attorneys' fees under § 285 involves a two-step process. First, a district court must determine whether the prevailing party has proved by clear and convincing evidence . . . that the case is 'exceptional.'. . . Second, if the district court finds the case to be exceptional, it must then determine whether an award of attorneys' fees is appropriate." *Kilopass Tech., Inc. v. Sidense Corp.*, 738 F.3d 1302, 1308-09 (Fed. Cir. 2013).

"A case may be deemed exceptional when there has been some material inappropriate conduct related to the matter in litigation, such as . . . misconduct during litigation, vexatious or unjustified litigation, conduct that violates [Fed. R. Civ. P.] 11, or like infractions. Absent misconduct in the litigation or in securing the patent, sanctions may be imposed against the patentee only if both (1) the litigation is brought in subjective bad faith, and (2) the litigation is objectively baseless." *Brooks Furniture Mfg. v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005) (citations omitted). As discussed below, this case is exceptional because PI engaged in material inappropriate conduct related to the litigation, and because it brought objectively baseless litigation in subjective bad faith.

### A.   NetApp Is the Prevailing Party

The parties have filed a stipulated motion to dismiss this case against NetApp with prejudice. NetApp is therefore the prevailing party for the purposes of 35 U.S.C. § 285. *See, e.g., Highway Equip. Co. v. FECO, Ltd.*, 469 F.3d 1027, 1035 (Fed. Cir. 2006); D.Del. LR 54.1(c) ("The defendant is the prevailing party upon a dismissal or summary judgment or other termination of the case without judgment for the plaintiff on the merits.").

**B.     This Case is Exceptional Based on PI's Material Inappropriate Conduct Related to the Litigation**

"[T]rial courts retain broad discretion to make findings of exceptionality under § 285 in a wide variety of circumstances." *Kilopass*, 738 F.3d at 1317.   For example, a case may be deemed exceptional where there has been "misconduct during litigation, vexatious or unjustified litigation, conduct that violates Federal Rule of Civil Procedure 11, or like infractions." *Id.* (quoting *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 916 (Fed. Cir. 2012)).   In such circumstances, a finding of exceptionality does not require a finding of bad faith or objective baselessness. *Kilopass*, 738 F.3d at 1317 & n.6.   "Litigation misconduct and unprofessional behavior may suffice, by themselves, to make a case exceptional under § 285." *Rambus Inc. v. Infineon Techs. AG*, 318 F.3d 1081, 1106 (Fed. Cir. 2003).

### 1.     PI Had No Reasonable Basis for Bringing This Suit

Although the Court does not have to find that PI violated Rule 11 to award attorneys' fees under Section 285, such conduct is sufficient to support an exceptional case finding. *KiloPass*, 738 F.3d at 1317.   Before filing suit, a patentee must "apply the claims of each and every patent that is being brought into the lawsuit to an accused device and conclude that there is a reasonable basis for a finding of infringement of at least one claim of each patent so asserted." *View Eng'g, Inc. v. Robotic Vision Sys.*, 208 F.3d 981, 986 (Fed. Cir. 2000).   "[T]he patent holder, if challenged, must be prepared to demonstrate to both the court and the alleged infringer exactly why it believed before filing the claim that it had a reasonable chance of proving infringement." *Id.* at 986.

In this case, PI did not perform an adequate pre-suit investigation before suing NetApp based on pNFS.   The asserted patents simply cannot be read to encompass pNFS, and PI has not produced any evidence that would suggest that PI could have a reasonable basis for believing

otherwise. Indeed, PI's actions in response to NetApp's efforts to learn the basis for PI's allegations further illustrate PI's lack of investigation.

PI did not respond to NetApp's May 16, 2013 letter seeking the bases for PI's allegations regarding pNFS, and did not produce any pre-suit investigation documents in response to NetApp's discovery. And in response to NetApp's interrogatory seeking information about PI's pre-suit investigation, PI simply pointed generally to its infringement contentions. (D,I. 43-1, at 22-23.) This is telling, because **PI's infringement contentions do not reference or implicate pNFS**. Thus, any pre-suit investigation either did not involve pNFS or made clear to PI that pNFS does not infringe the patents-in-suit. Either way, PI had no reasonable basis for bringing this suit or for serving three sets of disclosures identifying pNFS. This alone warrants an exceptional case finding. *Kilopass*, 738 F.3d at 1317.

### 2.    PI's Litigation Misconduct Also Supports an Exceptional Case Finding

PI also engaged in inappropriate litigation conduct. First, not only did PI not have a reasonable basis for the allegations in its Complaint, but the Complaint follows PI's pattern of vague, boilerplate pleading. In fact, this Court dismissed PI's complaint against other defendants based on nearly identical pleading, finding that PI's complaint "cannot possibly be a sufficient description." *See* C.A. No. 12-917-RGA, D.I. 14.

Next, PI conducted the litigation so as to do as little work as possible yet to put pressure on NetApp and other defendants to settle. As discussed above, with no basis, for over a year PI identified pNFS as the accused instrumentality. Eight months after filing its Complaint naming pNFS, PI reiterated that its claims were based on pNFS in its Paragraph 4(a) disclosures. PI didn't stop there, however. It then purported to amend its Paragraph 4(a) disclosures twice— months after the deadline in the Scheduling Order—each time confirming that pNFS was the accused system. When NetApp raised concerns about PI's identification of pNFS and asked for

14

more information, PI ignored the request and instead served 2,600 pages of infringement contentions that largely referenced third-party websites (some not in the English language) and left it to NetApp to figure out whether or not it was still accusing pNFS.

PI proceeded with a minimalist approach to the litigation, including discovery and claim construction. For example, PI did not adequately respond to discovery requests and served its own document requests months past the Court's date for document production to be substantially complete. Sayres Decl. ¶¶ 5, 6. Such exploitation of the discovery process "to impose disproportionate discovery costs on" defendants is another factor warranting an exceptional case finding. *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1327 (Fed. Cir. 2011).

PI also adopted a minimalist approach and flip-flopped during the claim construction process. It did not provide initial terms for construction except for means-plus-function terms (which require construction to determine the function and corresponding structure), then proposed blanket "plain and ordinary meaning" constructions for the terms. Sayres Decl., ¶ 7, Ex. E. It did so even though the common patent specification on its face purports to apply special lexicography for a number of these terms, and thus such terms are clearly not subject to "plain and ordinary meaning" construction. *See, e.g.*, '662 Patent (D.I. 1-1), at 5:11-13 ("memory section"); 5:27-29 ("management complex"); 6:5-8 ("switch fabric"); 17:7-11 ("shift register"). PI then repeatedly changed its proposed constructions throughout the claim construction process, and dropped its assertion of claims containing means-plus-function limitations after defendants had retained an expert and briefed those claims. *Id.* ¶¶ 9-11, Exs. G-I. PI's actions further support a finding of exceptionality. *See Eon-Net*, 652 F.3d at 1325 (affirming finding of litigation misconduct based in part on plaintiff's "failure to engage the claim construction process in good faith").

15

**C.  This Case is Also Exceptional Because it was Objectively Baseless Litigation and Brought in Bad Faith**

1.  <u>This Case Is Objectively Baseless</u>

A litigation is objectively baseless if "no reasonable litigant could reasonably expect success on the merits." *Highmark, Inc. v. Allcare Health Mgmt. Sys.*, 687 F.3d 1300, 1309 (Fed. Cir. 2012) (quotation omitted).  This objective prong "requires a retrospective assessment of the merits of the entire litigation determined based on the record ultimately made in the infringement proceedings," and thus "is a single backwards-looking inquiry into the reasonableness of the claims in light of the full record." *Id.* at 1310-11 (quotation omitted).

The full record of this case shows that PI's litigation against NetApp was objectively baseless.  There is simply no way the asserted patents read upon pNFS, which PI conceded by withdrawing its contentions regarding pNFS a year into the case. *See also* Eisler Decl., at ¶¶ 3, 6-8, 12.

2.  <u>PI Brought This Case in Subjective Bad Faith</u>

Similar to the objective prong, a determination as to a party's subjective state of mind for the purposes of Section 285 requires an assessment of "the totality of the circumstances." *Id.* at 1311.  "Factors such as the failure to conduct an adequate pre-suit investigation, vexatious or unduly burdensome litigation tactics, . . . or an oppressive purpose are factors which can be indicative of bad faith." *Kilopass*, 738 F.3d at 1311.

"[S]ubjective bad faith only requires proof that the lack of objective foundation for the claim was either known or so obvious that it should have been known by the party asserting the claim." *Id.* (internal quotation marks omitted).  In fact, "[o]bjective baselessness alone can create a sufficient inference of bad faith to establish exceptionality under § 285, unless the circumstances as a whole show a lack of recklessness on the patentee's part." *Id.* at 1314.

16

The totality of PI's conduct in this case constitutes subjective bad faith. As described above, PI brought this case asserting boilerplate infringement allegations that simply referenced pNFS and did not identify a specific accused product or service. PI's own discovery responses indicate that it had no reasonable basis for naming pNFS at the time it filed suit. Yet this did not stop PI, after having filed its complaint, from serving three sets of initial disclosures repeatedly identifying pNFS as the accused product, then ignoring NetApp when it asked for more information about these allegations. At the end of the day, PI's claims regarding pNFS were objectively baseless, and its conduct in repeatedly accusing pNFS and ignoring NetApp was, at a minimum, reckless. This alone is sufficient to establish bad faith. *Kilopass*, 738 F.3d at 1314; *see also Eltech Sys. Corp. v. PPG Indus., Inc.*, 903 F.2d 805, 811 (Fed. Cir. 1990) ("When a patentee is manifestly unreasonable in assessing infringement, while continuing to assert infringement in court, an inference is proper of bad faith.").

PI's bad faith is further evidenced by its conduct throughout the course of the litigation, including discovery and claim construction, as discussed above. This conduct allowed PI to expend as little effort as possible, while forcing NetApp and other defendants to incur substantial costs in investigating and defending PI's baseless claims. Such conduct is a hallmark of bad faith. *See Eon-Net*, 653 F.3d at 1327 (affirming district court's finding that plaintiff "acted in bad faith by exploiting the high cost to defend complex litigation to extract a nuisance value settlement").

PI's bad faith is further evidenced by its pattern of misconduct dating back to its earlier lawsuits. PI sued twenty-six defendants in numerous lawsuits, alleging vague and boilerplate allegations, all on an unenforceable patent. As with PI's case against NetApp, a reasonable pre-suit investigation would have shown that these cases should not have been brought in the first

place.   Yet PI repeatedly brought unjustified litigation, seeking to coerce settlements out of defendants weary of litigation costs and business disruption.   In light of its long and pervasive history of misconduct, PI can hardly claim that its actions in this case amounted to nothing more than a series of innocent mistakes.   IPNav, which directs PI's litigation, is a sophisticated litigant that must have known exactly what it was doing.   When examined under the totality of the circumstances, the only reasonable conclusion is that PI has engaged in a widespread pattern of baseless lawsuits and litigation misconduct, which it carried in exceptional fashion into this case.

### D. PI's Conduct Exemplifies the Sort of Abuse Section 285 Is Intended to Remedy

PI's conduct in this case—asserting baseless claims without adequate pre-suit investigation and then engaging in inappropriate litigation conduct in order to extract nuisance value settlements—is exactly what Section 285 is intended to remedy.   "[T]he purpose of [Section 285] was to give the court power to throw the burden of unnecessary and vexatious litigation on the shoulders of those who are responsible for it." *Colgate-Palmolive Co. v. Carter Products, Inc.*, 230 F.2d 855, 866 (4th Cir. 1956).   Although "[n]o award under Section 285 can fully compensate a defendant subjected to bad faith litigation, *e.g.*, for loss of executives' time and missed business opportunities," *Mathis v. Spears*, 857 F.2d 749, 754 (Fed. Cir. 1988), an award of needlessly spent attorneys' fees in defending unjustified litigation serves the legislative intent of remedying the negative effects of cases like this one.   PI should be held accountable for its actions and companies like NetApp should be encouraged that by doing the "right thing" in patent litigation they will be reimbursed accordingly.

### E. An Award of Fees Is Also Appropriate under the Court's Inherent Power to Manage Its Own Docket

In addition to Section 285, this Court has inherent power and discretion to impose sanctions in order to manage its own affairs and achieve orderly and expeditious disposition of

cases, including by awarding fees.  "The Supreme Court has recognized the inherent power of courts to impose sanctions in order to manage their own affairs and achieve orderly and expeditious disposition of cases."  *Ray v. Eyster (In re Orthopedic "Bone Screw" Prods. Liab. Litig.)*, 132 F.3d 152, 156 (3d Cir. 1997) (citations omitted).  "As a function of this power, courts can dismiss cases in their entirety, bar witnesses, award attorney's fees and assess fines."  *F.J. Hanshaw Enters. v. Emerald River Dev., Inc.*, 244 F.3d 1128, 1136 (9th Cir. 2001); *see also Braley v. Campbell*, 832 F.2d 1504, 1510 (10th Cir. 1987) (federal courts may impose monetary sanctions pursuant to their inherent right to manage their own proceedings, in order to, inter alia, "promote justice and judicial efficiency").

"[A] court may assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons."  *Chambers v. NASCO, Inc.*, 50 U.S. 32, 45-46 (1991) (internal quotation marks omitted).  This remedy serves "the dual purpose of vindicating judicial authority without resort to the more drastic sanctions available for contempt of court and making the prevailing party whole for expenses caused by his opponent's obstinacy."  Id. at 46 (internal quotation marks omitted).

In this case, as described above, PI "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons."  Indeed, this Court previously stated that it "certainly underst[ood] why NetApp might have a decent argument under one or more theories" as to why it should receive compensation from PI based on PI's actions.  Sayres Decl., ¶ 4, Ex. D at 27:4-9.  NetApp requests that this Court exercise its discretion and award NetApp compensation under its inherent power to manage its affairs.

## IV.    CONCLUSION

NetApp respectfully requests that the Court award compensation to NetApp for the expenses it needlessly incurred investigating and defending PI's baseless allegations against pNFS and associated litigation conduct.  NetApp requests an award of $480,000, which is a portion of the $660,000 NetApp has expended on this case, and which corresponds to the time period PI accused pNFS in this case.  NetApp is prepared to provide any further proof requested by the Court to support NetApp's request.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Jack B. Blumenfeld (#1014)
Rodger D. Smith (#3778)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com
mflynn@mnat.com

OF COUNSEL:

*Attorneys for Defendant NetApp, Inc.*

Natalie Hanlon-Leh
Joel D. Sayres
FAEGRE BAKER DANIELS LLP
3200 Wells Fargo Center
1700 Lincoln Street
Denver, CO  80203
(303) 607-3500

March 31, 2014 - Original and Redacted Filing Date

20

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2014, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on March 31, 2014, upon the following in the manner indicated:

Richard D. Kirk, Esquire                    *VIA ELECTRONIC MAIL*
Stephen B. Brauerman, Esquire
Vanessa R. Tiradentes, Esquire
Sara E. Bussiere, Esquire
BAYARD, P.A.
222 Delaware Avenue
Suite 900
Wilmington, DE  19801
*Attorneys for Plaintiff*

Marc Fenster, Esquire                       *VIA ELECTRONIC MAIL*
Brian Kedahl, Esquire
RUSS AUGSUT & KABAT
12424 Wilshire Boulevard
Suite 1200
Los Angeles, CA  90025
*Attorneys for Plaintiff*



Michael J. Flynn (#5333)