IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **Parallel Iron LLC,**<br><br>    Plaintiff;<br>    v.<br><br>**NetApp Inc.,**<br><br>    Defendant. | Civil Action No. 12-769-RGA |

MEMORANDUM OPINION

Stephen B. Brauerman, Esq. (argued), and Sara E. Bussiere, Esq., Bayard, PA, Wilmington, DE attorneys for the Plaintiff.

Rodger D. Smith, II, Esq., Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE; Natalie Hanlon-Leh, Esq. (argued), Faegre, Baker, Daniels LLP, Denver, CO, attorneys for the Defendant.

September 12, 2014

ANDREWS, UNITED STATES DISTRICT JUDGE:

Presently before this Court for disposition is Defendant NetApp Inc.'s motion for attorney fees. (D.I. 58). This matter has been fully briefed (D.I. 59, 64, 72) and the Court heard oral argument on June 25, 2014. (D.I. 82). The Court also reviewed the Plaintiff's pre-suit claim charts and other supporting materials submitted by the Plaintiff for *in camera* review pursuant to Court Order. (D.I. 81). Additionally, the Court reviewed copies of the infringement contentions provided from the Plaintiff to the Defendant during litigation. (D.I. 83). The Court also reviewed letters from the parties in response to the Court's Oral Orders. (D.I. 86, 89, 90). An *Amicus Curiae* brief was filed by Dell Inc., Huawei Technologies Co., Ltd., Kaspersky Lab Zao, Limelight networks, Inc., PNC Financial Services Group, Inc., SAS Institute Inc., Vizio, Inc., and Xilinx Inc. in support of the Defendant. (D.I. 80). For the reasons set forth herein, the Defendant's motion is **GRANTED**.

I. BACKGROUND

Parallel Iron brought this suit against NetApp on June 18, 2012. (D.I. 1). Parallel Iron alleged that NetApp infringes U.S. Patents No. 7,197,662, 7,958,388, and 7,543,177. *Id.* The complaint identifies the accused products as "by way of example and without limitation, those implementing" parallel Network File System (pNFS). *E.g., Id.* at ¶ 13. On February 15, 2013 Parallel Iron served its 4(a) disclosures, which identified the Defendant's accused products only in relation to their implementation of pNFS. (D.I. 43-1 at 2-3 ("Parallel Iron is asserting the patents-in-suit against all of NetApp's products and/or services that implement the parallel Network File System . . . including but not limited to, the NetApp E-Series Platform products and products using the Engenio external storage systems. . . .")). Parallel Iron served its "Amended Disclosures" on April 23, 2013, only identifying products by their use of pNFS. *Id.*

2

at 5 ("Parallel Iron is asserting the patents-in-suit against all of NetApp's products and/or services that implement the parallel Network File System . . . including, but not limited to: (1) the NetApp E-Series Platform products and products using the Engenio external storage systems . . . ; and (2) the FAS 6200 Series Enterprise Storage Systems."). On May 7, 2013, Parallel Iron served its second amended 4(a) disclosures, which additionally identified Hadoop related products. *Id.* at 8. However, the products were still identified based upon the accused products use of pNFS. *Id.*[1] After receiving Parallel Iron's second amended disclosures, NetApp wrote Parallel Iron on May 16, 2013 regarding "(1) the untimeliness of [Parallel Iron]'s purported amendments to its disclosures; (2) the failure of [Parallel Iron] to sufficiently identify an accused product other than its reference to pNFS; and (3) that the E-Series category of products referenced in [Parallel Iron]'s disclosures did not practice pNFS." (D.I. 59 at 13 (citing D.I. 43-1 at 11-14)). Additionally, NetApp's letter requested the pre-suit basis for Parallel Iron's allegations regarding pNFS. (D.I. 59 at 13; D.I. 43-1 at 16). On May 25, 2013 Parallel Iron served 2,600 pages of infringement contentions. (D.I. 59 at 14). The contentions listed specific products, but did not mention pNFS. *Id.* The parties had a meet and confer call on August 22, 2013, during which Parallel Iron confirmed that it was no longer accusing pNFS. *Id.* at 15.

Based upon Parallel Iron's indication that it was no longer accusing pNFS, NetApp requested a discovery dispute conference with the Court, and filed a discovery dispute letter as per the scheduling order for this case. (D.I. 43). The Court held a discovery conference on September 27, 2013. (D.I. 47). Based upon a joint stipulation (D.I. 49), the Court granted a stay of this case on October 10, 2013 pending the final resolution of several related cases involving

---

[1] "Parallel Iron is asserting the patents-in-suit against all of NetApp's products and/or services that implement the parallel Network File System ("the Accused Instrumentalities") including, but not limited to: (1) the NetApp E-Series Platform products and products using the Engenio external storage systems . . . ; (2) the FAS6200 Series Enterprise Storage Systems; and (3) Hadoop related products." (1:12-cv-00769-RGA D.I. 43-1 at 8).

3

the same patents. (D.I. 50). The Court in part granted this stay as a remedy to NetApp for Parallel Iron's altering its allegations from pNFS to Hadoop. *Id.* at 1.

On January 22, 2014, Parallel Iron granted a license to the asserted patents to Unified Patents, Inc.[2] (D.I. 59 at 16; D.I. 82 at 7). The Agreement granted a sublicense to NetApp, with no requirement for NetApp to pay any money to Parallel Iron. *Id.*

## II. ANALYSIS

NetApp seeks a fee award under 35 U.S.C. § 285 and the Court's inherent powers. The Court will take these two bases for awarding fees in turn.

### A. 35 U.S.C. § 285

#### i. *Legal Standard*

The Patent Act provides that "in exceptional cases [the court] may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. Thus, under the statute there are two basic requirements: (1) that the case is "exceptional" and (2) that the party seeking fees is a "prevailing party." The Supreme Court recently defined an "exceptional" case as "simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014). When determining whether a party is a prevailing party, the Federal Circuit has followed the Supreme Court's definition of a prevailing party as used in other fee-shifting statutes. *Inland Steel Co. v. LTV Steel Co.*, 364 F.3d 1318, 1320 (Fed. Cir. 2004). In *Inland Steel*, the Federal Circuit held that district courts are to "apply the general principle that to be a

---

[2] The Court did not receive a copy of this license agreement.

prevailing party, one must receive at least some relief on the merits, which alters . . . the legal relationship of the parties." *Id.* (quotation marks omitted, ellipses in original).

The Federal Circuit's definition of a prevailing party derives from a series of Supreme Court decisions. The term "prevailing party" is "a legal term of art." *Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Human Res.*, 532 U.S. 598, 603 (2001). The Supreme Court defined a prevailing party, for the purpose of attorney's fees shifting, to be a party which "succeed[s] on any significant issue in litigation which achieves some of the benefit the part[y] sought in bringing suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (defining a prevailing party in the context of a 42 U.S.C. § 1988 attorney fee shifting claim). The Supreme Court later held that, while is it "settled law . . . that relief need not be judicially decreed in order to justify a fee award," there must be at least the "settling of some dispute which affects the behavior of the defendant towards the plaintiff." *Hewitt v. Helms*, 482 U.S. 755, 761 (1987) (italics omitted). The Supreme Court then further refined its previous rulings by holding that the relief must actually affect the parties' behavior. *Farrar v. Hobby*, 506 U.S. 103, 111 (1992). Furthermore, the Court emphasized that "the touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties." *Id.* (brackets omitted); *see also Lefemine v. Wideman*, 133 S. Ct. 9, 11 (2012). Independent of what relief is received, it "must directly benefit [the party] at the time of the judgment or the settlement." *Id.* Even "nominal damages suffices under this test." *Buckhannon Bd. & Care Home, Inc.*, 532 U.S. at 604 (citing *Farrar*). Finally, the Supreme Court has made clear that:

> We have only awarded attorney's fees where the plaintiff has received a judgment on the merits or obtained a court-ordered consent decree — we have not awarded attorney's fees where the plaintiff has secured the reversal of a directed verdict or acquired a judicial pronouncement that the defendant has violated the Constitution unaccompanied by judicial relief. Never have we awarded attorney's fees for a nonjudicial alteration of actual circumstances.

5

*Buckhannon*, 532 U.S. 598, 605-06 (2001). In sum, precedent from both the Supreme Court and the Federal Circuit make clear that for a party to be a *prevailing party*, that party must win a dispute within the case in favor of it that materially alters the legal relationship between the parties at the time of the judgment.

    ii.  *Discussion*

The Defendant contends that it is a prevailing party as the "parties have filed a stipulated motion to dismiss this case against NetApp with prejudice." (D.I. 59 at 17). The Defendant emphasizes that the Plaintiff initially accused pNFS technology, only to later abandon this argument. (D.I. 72 at 5). The Plaintiff argues that NetApp is not the prevailing party because the "case was resolved by virtue of license agreements Parallel Iron entered into with two third-parties that benefitted NetApp." (D.I. 64 at 12).[3] Furthermore, Parallel Iron argues that NetApp cannot be a prevailing party as the "Court did not enter judgment on the merits, did not incorporate the third-party license agreements into any judicial decree, and did not grant the stipulation of dismissal based on the review of any settlement agreement between the parties." *Id.*

The Federal Circuit has determined whether there is a prevailing party in several instances. In *Power Mosfet*, the Court determined that when a party voluntarily dismisses its case with prejudice against the defendant, after it had been determined that the patent-in-suit was not infringed and had not been proven invalid or unenforceable, the defendant is the prevailing party. *Power Mosfet Technologies, L.L.C. v. Siemens AG*, 378 F.3d 1396, 1406, 1416 (Fed. Cir. 2004). Similarly, in *Highway Equipment*, not only had the case progressed "through the final

---

[3] The Plaintiff identifies a second license agreement with RPX as providing a license with NetApp. RPX paid valuable consideration for the License. (D.I. 66 ¶ 7). NetApp does not contest this assertion in its Reply Brief. (D.I. 72).

6

pretrial conference to the eve of trial," but the District Court had found that the patentee had provided no explanation as to why it had decided to dismiss the case with prejudice on such a late date. *Highway Equip. Co., Inc. v. FECO, Ltd.*, 469 F.3d 1027, 1035 (Fed. Cir. 2006). The Federal Circuit held that, "as a matter of patent law, the dismissal with prejudice, based on the covenant [not to sue] and granted pursuant to the district court's discretion under Rule 41(a)(2), has the necessary judicial imprimatur to constitute a judicially sanctioned change in the legal relationship of the parties" sufficient to award fees under 35 U.S.C. § 285. *Id.*

This case is unlike *Power Mosfet* and *Highway Equip.* I have made no finding regarding any substantive issue in the case. I have not construed any terms, resolved a contested motion to dismiss, or resolved any motions for summary judgment. Discovery, while stayed, was incomplete at the time the case with dismissed. Furthermore, unlike in *Highway Equip.*, where there was no reason given for the motion to dismiss, here it is clear that the Stipulation of Dismissal was required as a result of a third-party licensing agreement. (D.I. 82 at 7). Furthermore, no evidence has been provided to the Court that the third-party licenses were token licenses. While the Defendant's attorney argued at the hearing that the Unified Patents license did not involve a monetary payment, the Defendant's attorney conceded that it did involve other consideration, such as agreeing to the dismissal of an inter partes review. *Id.* at 8-9. The Court was not provided with copies of the licenses, but has been provided with an affidavit stating the consideration for the two licenses. (D.I. 66 at ¶¶ 7-8).

As I recently held in another decision, it cannot be the case that a party "can benefit from a bona fide license agreement, obtained after the litigation began, and claim to be the prevailing party, without a single substantial court decision that favors that party." *Pragmatus Telecom LLC v. Newegg Inc.*, 2014 WL 3724138 at *3 (D. Del. July 25, 2014), *appeal pending*, No. 14-

1777 (Fed. Cir). At oral argument the Court posed a question for the Defendant; "[I]f [the Defendant] pay[s] a million dollars for a license and then dismiss[es] the case, [the Defendant] is the prevailing party, but if [the Plaintiff] go[es] to trial and get[s] a jury verdict for 500,000, [the Plaintiff is] the prevailing party?" (Tr. at 7). The Defendant responded, in sum, yes. I cannot agree. It makes no sense that the parties can receive effectively the same result, and in one situation the Defendant can get fees under § 285, but in the other, the Defendant cannot recover fees.

The Supreme Court has made clear that there must be a dispute that was settled in favor of the party seeking to be declared the prevailing party that materially alters the legal relationship between the parties. Here, Parallel Iron licensed the patent, which led to downstream licensures for the users, including NetApp. There was no settlement agreement, the Court made no findings on the merits, and the case was not resolved via a consent decree. Therefore, under these circumstances, NetApp is not a prevailing party under 35 U.S.C. § 285. Thus the Defendant's motion for fees under § 285 is denied.

### B. Court's Inherent Power

NetApp moves the Court to award it attorney's fees under its inherent powers. (D.I. 59 at 23-24).

#### i. *Legal Standard*

"It has long been understood that certain implied powers must necessarily result to our Courts of justice from the nature of their institution, powers which cannot be dispensed with in a Court, because they are necessary to the exercise of all others." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (internal quotation marks and brackets omitted). Therefore, courts are "vested, by their very creation, with power to impose silence, respect, and decorum, in their

presence, and submission to their lawful mandates." *Id.* The court's "power reaches both conduct before the court and that beyond the court's confines" as the underlying purpose of the Court's power is to stem "disobedience to the orders of the Judiciary, regardless of whether such disobedience interfered with the conduct of trial." *Id.* at 44 (internal brackets and quotation marks omitted). Furthermore, a court "may assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers*, 501 U.S. at 45-46 (internal quotation marks omitted).[4]

> The Third Circuit has held that:
>
> Because of their very potency, inherent powers must be exercised with restraint and discretion. A primary aspect of a district court's discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process. Thus, a district court must ensure that there is an adequate factual predicate for flexing its substantial muscle under its inherent powers, and must also ensure that the sanction is tailored to address the harm identified. In exercising its discretion under its inherent powers, the court should be guided by the same considerations that guide it in the imposition of sanctions under the Federal Rules. First, the court must consider the conduct at issue and explain why the conduct warrants sanction. If an attorney, rather than a client, is at fault, the sanction should ordinarily target the culpable attorney.

*Republic of Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 74 (3d Cir. 1994).

          ii.    *Discussion*

NetApp argues that the Court should exercise its discretion and award NetApp compensation under its inherent powers. (D.I. 59 at 24). Conversely, Parallel Iron argues that the Court should refrain from exercising its discretion as Parallel Iron did not act in bad faith, vexatiously, wantonly, or for oppressive reasons. (D.I. 64 at 23). The Court disagrees with the Plaintiff and finds that Parallel Iron did act in bad faith, vexatiously, and wantonly as it brought

---

[4] Both parties agree that the Court has the requisite inherent power to address this issue, even at this stage. (*See* D.I. 82 at 25, 35 (Plaintiff's attorney stating, "I do believe your Honor has the power now[,] even at this stage of the case[,] to address [this issue].") Additionally, Plaintiff's attorney agreed that the Court's inherent power is not limited by a determination of who is the "prevailing party" in the case. *Id.* at 34-35.

9

this suit without a good faith basis and then continued to litigate the case via a misleading and prejudicial litigation strategy. This issue was originally raised in front of me at a discovery dispute held on September 27, 2013, during which I indicated that I understood why NetApp might have a decent argument that it should be compensated for Parallel Iron's actions, but that I felt that the issue was better put off until the entire case was resolved. (D.I. 47 at 27). That time is now.

From the very beginning of this suit Parallel Iron accused Defendant's products by reference to their implementation of the pNFS standard. (*See* D.I. 1). Parallel Iron then continued to accuse the Defendant's implementation of pNFS in its 4(a) disclosures. Specifically, eight months after Parallel Iron's complaint, it identified the accused instrumentalities as those that implement pNFS, "including, but not limited to, the NetApp E-Series Platform products and products using the Engenio external storage systems. . . ." (D.I 43-1 at 2). Then two months later, on April 23, 2013, Parallel Iron served amended 4(a) disclosures that again solely identified the accused products as those that used pNFS. *Id.* at 5. On May 7, 2013, Parallel Iron again confirmed in its second amended 4(a) disclosures that it was accusing NetApp's products or services that utilized pNFS. *Id.* at 8. Despite Parallel Iron's three 4(a) disclosures and its complaint accusing pNFS, its infringement contentions served on May 25, 2013 did not mention pNFS. However, it was not until NetApp served an interrogatory on Parallel Iron, asking, "For any asserted Claim that Parallel Iron contends are partially or fully satisfied by compliance with an industry standard, please identify the specific standard, the pertinent section, and state whether Parallel Iron, the named inventors, and/or any agent of Parallel Iron took part in the standards process." *Id.* at 37. Parallel Iron responded on August 5, 2013, "Parallel Iron does not contend at this point that any Asserted Claim is satisfied by

compliance with an industry standard." In other words, Parallel Iron strung the Defendant along for one year, one month, and eighteen days stating that they were accusing products that implemented pNFS,[5] only to state, when directly asked in an interrogatory, that they had no intention of accusing products implementing the pNFS standard.

In order to determine whether Parallel Iron had a good faith pre-suit belief that NetApp infringed the patents-in-suit, at oral argument the Court ordered Parallel Iron to submit all materials that it had gathered or created during its pre-suit investigation related to this issue. Parallel Iron produced 1,040 pages of documents, including claim charts prepared by Parallel Iron and its various counsel and advisors and samples of various public materials that Parallel Iron relied upon in preparing the claim charts. Following this submission, the Court ordered Parallel Iron to identify, with specificity, locations in the *in camera* documents where it purported to have a reason to believe that NetApp used pNFS. Parallel Iron identified six documents that purported to connect pNFS to NetApp's products. (D.I. 86). The Court is not impressed with any of these citations.

As the initial complaint solely identified NetApp's implementation of pNFS as the accused product or service, for there to be a minimal pre-suit investigation, it would have been necessary for Parallel Iron to have conducted some investigation as to whether (1) NetApp implemented pNFS, and (2) did so in such a way as to infringe each of the patents-in-suit. Both the specific documents cited to the Court in Parallel Iron's August 6, 2014 letter (D.I. 86) and the Court's own review of the documents demonstrate that Parallel Iron initiated this suit without a good-faith belief that the accused instrumentalities implemented pNFS in an infringing manner.[6]

---

[5] pNFS is an industry standard. Therefore, stating that one uses pNFS describes an overarching technology, not a specific product, system, or method.
[6] The Federal Circuit has made clear "that a district court may rely on an industry standard in analyzing infringement. If a district court construes the claims and finds that the reach of the claims includes any device that

11

In fact, it is apparent to the Court, after reviewing the documents submitted for *in camera* review, that the Plaintiff has provided no evidence that there was even a minimal investigation into NetApp's actual implementation of pNFS.

The Plaintiff's *in camera* documents indicate that the only NetApp product that the Plaintiff charted pre-suit was FAS6200. (*See in camera* review document submitted July 22, 2014 bates stamped PI285MOT00019-33, PI285MOT00057-72, PI285MOT00073-110). However, the Plaintiff identified no section of these claim charts in its August 6, 2014 letter as connecting NetApp to pNFS, thus failing to show that FAS6200 used pNFS. (*See* D.I. 86). Furthermore, upon the Court's own examination of the aforementioned claim charts, the Court is unable to find any reference to pNFS. Thus, Parallel Iron's charting of FAS6200 does not meet even the most minimal requirements of a pre-suit investigation for a suit charging infringement based on FAS6200's implementation of pNFS.[7]

Parallel Iron additionally charts the basic pNFS standard. (*See in camera* review document submitted July 22, 2014 bates stamped PI285MOT000134-54 (claim chart for the `177 patent and pNFS); PI285 MOT000155-75 (claim chart for the `388 patent and pNFS); PI285MOT000176-195 (claim chart for the `662 patent and pNFS)). However, the Court is unable to find any reference to NetApp anywhere in the charts. Furthermore, akin to Parallel Iron's charting of FAS6200, Parallel Iron does not cite to any location within these claim charts that would connect pNFS with NetApp. (*See* D.I. 86). Thus, neither the charting of the pNFS

---

practices a standard, then this can be sufficient for a finding of infringement." *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1327 (Fed. Cir. 2010). However, this analysis is based on the presumption that "an accused product operates in accordance with [the] standard" as "[o]nly in the situation where a patent covers every possible implementation of a standard will it be enough to prove infringement by showing standard compliance." *Id.* at 1327-28. The Parallel Iron's pre-suit investigation included no such evidence.

[7] If the Plaintiff had accused FAS6200 in such a way as to not limit it to FAS6200's use of pNFS, there might have been a sufficient pre-suit basis for this suit. However, Parallel Iron accused NetApp's use of pNFS.

standard nor of FAS6200 satisfied the Plaintiff's burden to conduct a minimal pre-suit investigation for the suit it actually filed and litigated.

In the Plaintiff's August 6, 2014 letter, the Plaintiff does cite to a white paper published in January 2012 by NetApp suggesting that NetApp had used a form of pNFS. (*See in camera* review document submitted July 22, 2014 bates stamped PI285MOT000113-20 ("[Netapp] delivered a path to offer scalable storage based on the IETF pNFS standard that builds on the capabilities [NetApp] ha[s] developed for the Data ONTAP operating systems.")). The Court finds that the white paper does nothing more than discuss "the basic operation of pNFS and describe[] the pros and cons of the available data layouts. Guidance is also provided for implementation planning." *Id.* at PI285MOT00113. In fact, the one product/technology discussed in the white paper that might utilize pNFS, "Data ONTAP 8.1 operating in Cluster-Mode," was not charted by Parallel Iron before instigating this suit. *Id.* at PI285MOT000120. Furthermore, the white paper, by itself, does not provide sufficient detail regarding NetApp's usage of pNFS to lead to any conclusion as to whether NetApp actually implemented pNFS in any particular product, let alone in such a way that would infringe one of the patents-in-suit. This is simply not sufficient for a pre-suit investigation.

The other documents cited by Parallel Iron as evidence that NetApp used pNFS simply indicate that NetApp, or its employees, contributed to the creation of the pNFS standard, not that pNFS was implemented by NetApp. For example Parallel Iron cites to the document "Internet Engineering Task Force (IETF) Request for Comments: 5661 Category: Standards Track ISSN: 2070-1721 by S. Shepler, Ed., Storspeed, Inc, M. Eisler, Ed., D. Noveck, Ed., and NetApp." (D.I. 86 at 2). However, this document simply shows that NetApp, along with two of its employees, helped edit the NFSv4.1 standard, which included the pNFS standard as an option.

(D.I. 86 at 3; *in camera* review document submitted July 22, 2014 bates stamped PI285MOT000242-858). The fact that NetApp and its employees participated in the creation of a standard cannot by itself provide evidence suitable for a pre-suit investigation to conclude that NetApp actually infringed each, or even one, of the patents-in-suit.

Parallel Iron argues that this case "was never limited to pNFS" as it had an "independent basis to maintain this lawsuit based on NetApp's infringement of the Patents in Suit using, for example, NetApp's FAS6200 Enterprise Storage System and Hadoop related products." (D.I. 64 at 15).[8] Even assuming that Parallel Iron's intention from the beginning of the case was not to limit the case to pNFS, Parallel Iron stated time and time again to NetApp that it was accusing only products that implemented pNFS. In fact, when Parallel Iron did identify specific products such as FAS6200, it did so by stating, "Parallel Iron is asserting the patents-in-suit against all of NetApp's products and/or services that implement the [pNFS] including, but not limited to: (1) . . . . FAS6200. . . ." (D.I. 43-1 at 5-6). Each of Parallel Iron's 4(a) disclosures makes clear that Parallel Iron was limiting its suit to pNFS. No reasonable person could interpret the quoted sentence, or anything else in any of the 4(a) disclosures, as stating that Parallel Iron was accusing NetApp systems that use pNFS and separately accusing the FAS6200 product or any other products that did not use pNFS. Furthermore, despite having charted FAS6200 during the Plaintiff's pre-suit investigation (*in camera* review document submitted July 22, 2014 bates stamped PI285MOT000057-110), Parallel Iron did not mention it as an accused product in its 4(a) disclosures of February 15, 2013.

Parallel Iron argues it conducted a proper pre-suit investigation as its investigation was costly and extensive. (D.I. 64 at 8). Parallel Iron states that "Mr. Dodd, one of the named

---

[8] In a way, if this were true, Plaintiff ought to be sanctioned for hiding the ball.

14

inventors, performed his own extensive analysis concerning NetApp's infringement." *Id.* (citation omitted). Additionally, Parallel Iron states that it "enlisted a team of experts, consultants and legal advisors to perform additional work and pre-suit analysis." *Id.* Parallel Iron paid outside consultants a total of $32,000. *Id.* While the Court believes that some investigation did occur, the Court finds no evidence that the Plaintiff's investigation of NetApp was "extensive," let alone minimally sufficient. When asked at the hearing about the $32,000, the Plaintiff's counsel indicated that this amount was spent on the investigation for all second round litigants and likely included costs spent on first round litigants. (D.I. 82 at 37-38). Even assuming the cost only covered second round litigants, there are 26 related cases in this District alone that this cost would have been split among.

For the reasons stated above the Court finds that the Plaintiff litigated this case in bad faith, vexatiously, and wantonly. Therefore the Court finds it necessary to impose sanctions on Parallel Iron, not only to compensate NetApp, but also to deter Parallel Iron from continuing to litigate in such a manner in the future.[9] [10]

NetApp requested an award of sanctions in the amount of $480,000, which it states is the portion of its fees that are attributable to the cost associated with Parallel Iron's accusation of pNFS. (D.I. 59 at 25). Parallel Iron objected to this amount of fees in its Answering Brief. (D.I.

---

[9] The Court notes that it previously gave Parallel Iron the benefit of the doubt. *See Parallel Iron LLC v. Adknowledge Inc.*, 2012 WL 5392251 (D. Del. Nov. 2, 2012) (denying exceptional case sanctions because the Court thought that Parallel Iron was incompetent rather than acting in bad faith).

[10] The Third Circuit has held that, "[It] will not adopt a broad rule . . . that once a claim is held not to violate Rule 11, the court is prevented from imposing sanctions under its inherent power." *Gillette Foods Inc. v. Bayernwald-Fruchteverwertung, GmbH*, 977 F.2d 809, 813 (3d Cir. 1992). Here the Court is prevented from granting sanctions pursuant to Rule 11, not because the conduct did not violate Rule 11, but because of the procedural posture of the case. Furthermore, parallel to the Third Circuit's reasoning regarding Rule 11, there is no logical reason that just because the Plaintiff cannot be subject to 35 U.S.C. § 285, the Plaintiff cannot be subject to the Court's discretionary powers. Here, again the only reason the Court does not grant the motion as to 35 U.S.C. § 285 is because the Court found that the Defendant was not a "prevailing party," not because the Court determined that the case was not "exceptional."

64 at 23). The Court is not now in a position to judge whether NetApp's request for fees is accurate, and therefore the Court will include in its order a briefing schedule to address the amount of fees appropriate in this case.

### III. CONCLUSION

For the reasons above, the Court will **GRANT** Defendant NetApp Inc.'s motion for attorney fees. (D.I. 58). The parties are to provide supplemental briefing regarding the amount of damages in accordance with the accompanying Order.